IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JOHN DOE**<br>c/o Kevin E. Byrnes<br>Grad, Logan & Klewans, P.C.<br>3141 Fairview Park Drive, Suite 350<br>Falls Church, Virginia 22042<br>    *Plaintiff*,<br><br>v.<br><br>ERIC H. HOLDER, JR.<br>United States Attorney General<br>United States Department of Justice<br>950 Pennsylvania Ave., NW<br>Washington, DC 20530-0001<br>    *Defendant.* | Civil Action No. _____ |

**SERVE:**   Ronald C. Machen, Jr.,
United States Attorney for the District of Columbia
555 4th Street, NW
Washington, D.C. 20530

## COMPLAINT

Comes now, the Plaintiff, "John Doe", and complains as follows:

### I.   PARTIES

1. <u>Defendant: Eric H. Holder, Jr.,</u> is the Attorney General of the United States and is the proper named Defendant in this action. On information and belief, Mr. Holder is a nominal Defendant only. The actual decision makers in this case are officials in the Federal Bureau of Investigation ("FBI"), which is an entity that is part of the Department of Justice.

2. <u>Plaintiff: John Doe:</u> is a Special Agent of the FBI, who at all times relevant to the matters at issue in this Complaint, was employed in the Counter Terrorism Division of the FBI.

## II.   JURISDICTION AND VENUE

3.   Jurisdiction exists pursuant to 29 USC §1391 (federal question) in that the Complainant is a federal employee bringing a federally based claim pursuant to the Rehabilitation Act of 1973.

4.   Venue lies in the United States District Court for the District of Columbia as the wrongful acts complained of emanated from the Headquarters of the Federal Bureau of Investigation, and supervisors in the Headquarters Division, which is located in the District of Columbia. Although the Plaintiff was physically located in the area of Tysons Corner, Virginia, the conduct at issue occurred in the District of Columbia and the actual persons employed by the Defendant entity that engaged in the misconduct are located in Washington, D.C. See 29 USC §1391(b)(1); 28 USC 1391(e)(1)(a) and (b).

5.   Venue also lies in the District of Columbia since the acts constituting the unlawful employment practices emanated from FBI Headquarters, and the records related to that practice were and are maintained in Washington, D.C. See 42 USC 2000e(5)(f)(3).

## III.   FACTS

6.   Plaintiff, John Doe, is a Special Agent for the Federal Bureau of Investigation, who engaged in conduct which involved "pinning" money on a female staff member in January, 2009.

7.   "Pinning" was, according to Mr. Doe, an African American tradition used in the American South which involves placing money on a celebrant as an expression of recognition for their birthday.

8.   John Doe, who had engaged in what he perceived as a "mentor" relationship with the female staff member, later learned that the female staff member was disturbed by his actions.

9. Mr. Doe apologized to the staff member and considered the matter closed.

10. On October 16, 2009, Mr. Doe was advised he was being proposed for suspension for twenty days based on his interaction with the female.

11. On October 30, 2009, Mr. Doe received a letter stating a "completed OPR adjudication" substantiated the allegation that Mr. Doe had "dropped several dollar bills down the front shirt of a female co-worker." In reality, Mr. Doe has merely placed the money on the woman's outer garment and there had been "adjudication", only a proposed suspension action.

12. In the letter, Mr. Doe was specifically ordered to get "treatment" by "clinically licensed mental health professionals" for this behavior.

13. In the letter, Mr. Doe was told his supervisor "will monitor" his treatment.

14. In the letter, Mr. Doe was ordered to provide signed copies of releases "to allow contact to and from all of your treating clinicians."

15. On February 4, 2010, the Agency imposed a twenty day suspension. Mr. Doe was still under a directive to seek psychological counseling, despite this discipline.

16. On March 15, 2010, Mr. Doe, while undergoing treatment, filed an informal complaint of discrimination in writing with Veronica Venture of the Agency's EEO, which *inter alia*, specifically alleged "perceived disability", "improper post-employment psychological/psychiatric evaluation" and "improper collection, maintenance and use of medical records."

17. On April 23, 2010, Mr. Doe protested the employer mandated psychological evaluation in a letter from his counsel. Mr. Doe noted there was no basis for the evaluation, that it violated the Code of Federal Regulations as they related to such examinations and that Mr. Doe's workplace incident raised no issue of any actual or logically perceived impairment.

18. Mr. Doe specifically challenged the Agency's authority to order the medical inquiry, to order it as a part of a disciplinary process, demand Mr. Doe pay for the examination and demand that he execute a release of medical records as part of a private, employer paid evaluation.

19. The Agency ignored the letter and never responded to Mr. Doe or his counsel.

20. The informal complaint also demanded the Agency protect and preserve all electronic communications and writing in anticipation of future litigation.

21. The Agency failed to properly act on the complaint and conducted no informal review as was required under 29 CFR 1614 (Federal Sector EEO Processing).

22. On June 29, 2010, Mr. Doe filed a formal complaint of discrimination since some 105 days had passed without Agency processing the action informally.

23. In July, 2010, the Agency acknowledged receipt of the formal complaint of discrimination. It never explained the delay in acceptance of the matter nor did it explain its initial lack of formal processing.

24. Oddly, in August, 2010, the Bureau tired to contend it lacked information to process the complaint investigation and threatened dismissal.

25. In September, 2010 the FBI formally "accepted" the complaint. The FBI immediately tried to get a continuance from Mr. Doe to investigate the matter. Mr. Doe, frustrated by the Agency's failure to follow EEO directives and its unexplained delay, refused.

26. The FBI EEO investigation that was conducted wrongfully listed May 13, 2010, as the initial contact date, when, in fact, Mr. Doe contacted the FBI in writing on March 15, 2010, to raise his allegations, including those that applied to the FFDE.

27. The Agency also incorrectly listed June 18, 2010, as the date it advised Mr. Doe of his right to file a complaint.

28. In reality, the FBI was misrepresenting its own actions to cover its failure to timely investigate and attempt to resolve Mr. Doe's claims within 15 days of his contact as is required by federal sector EEO processing guidelines.

29. Mr. Doe protested the failure of the Agency to timely process the complaint, in writing, on June 2, 2010.

30. The FBI counselor never even prepared a report until July 7, 2010 and misstated attempts to contact Mr. Doe.

31. On information and belief, this delay was conscious and coordinated and was done to allow the Agency to complete its disciplinary process against Mr. Doe before he could use the EEO process to obtain information and was further designed to allow the FBI to complete its psychological assessment of Mr. Doe prior to any EEO review.

32. The FBI process was and is so antiquated that when investigating and assessing Mr. Doe's claims, it defined them as "mental handicap" a term that is both anachronistic and pejorative.

33. The Agency did not conduct its initial investigation until May of 2011.

34. Indeed, it continued to issue "supplements" to the investigation in June, 2011.

35. In the underlying personal action, Mr. Doe freely admitted his conduct, but provided an oral and written reply to the proposal and contested the severity and motivation for the discipline.

36. Using the FBI's internal disciplinary procedure, Mr. Doe appealed the decision of the Agency's February 4, 2010, Office of Professional Responsibility, to the FBI's Disciplinary Review Board (DRB) noting:

> "On the same day the disciplinary action was proposed, the FBI, through personnel unknown directed Mr. Doe to a mandatory Fitness For Duty Examination on October 16, 2009.
>
> The FFDE consisted of a series of visits between October 16, 2009 to May 27, 2010 and included mandatory cognitive behavioral therapy."

37. In his DRB appeal, Mr. Doe contended that he had a professional and personal non-intimate relationship with the female worker. He claimed that his "pinning" of money was never meant to be sexually harassing or inappropriate and that he was stunned and upset to learn his actions were later perceived as inappropriate.

38. Mr. Doe noted he had immediately and forcefully apologized for his actions once he was made aware of the issue.

39. Mr. Doe stated his apology was accepted and that he went so far as to offer to apologize to others as well.

40. As to the mandatory psychological referral of October 30, 2009, the FBI provided no coherent explanation for the referral.[1] The Bureau cited no concerns for the safety of the Agent or others, nor did they identify how the conduct in question required a psychological examination of Mr. Doe. The FBI never stated why the referral should occur before discipline was considered or imposed.

---

[1] Later, in response to the internal EEO investigation of the complaint the FBI belatedly cited Executive Orders on National Security and the Adjudicative Guidelines for Clearances, neither of which were applicable here and both of which, if used, would establish the Bureau perceived Mr. Doe as disabled.

41. Mr. Doe's subsequent examination as a result of the referral revealed no mental health condition that would impair or impede his ability to perform the duties of a Special Agent.

42. Indeed, the examination revealed no evidence of a mental disturbance or disease of any kind.

43. At the time of the examination, the Agency, through its Health Unit officials, demanded Mr. Doe sign a waiver to disclose all of his medical information to his employer.

44. The FBI never identified who would receive the psychological and medical information in question and never identified how it would segregate, maintain and protect the collection, use and dissemination of the medical information in question.

45. In June, 2010, Mr. Doe filed a complaint pursuant to the Rehabilitation Act of 1973, contending that the FBI had violated 5 CFR 339.101, *et. seq.* (the federal fitness for duty examination regulation) and the Rehabilitation Act of 1973, which those regulations specifically incorporate by reference.

46. Mr. Doe alleged that the FBI, as a discriminatory pattern and practice, was misusing FFDE's as a disciplinary tool.[2]

47. Between May and June, 2011, more than a year after Mr. Doe's formal complaint was filed, the FBI conducted an internal EEO investigation pursuant to the Federal Sector EEO Processing Regulations set forth at 29 CFR 10.

48. During the course of that investigation, FBI personnel provided sworn statements.

---

[2] The Agency confirmed it had sent no less than four (4) agents in 2009-2010 for such exams based on allegations related to sexual misconduct.

7

49. Based on these statements and upon information and belief, the FBI has conducted minimal training on the Rehabilitation Act, 5 CFR 339.101 *et. seq.* or on the proper use of employer mandated psychological examinations to its supervisors and to members of its Health Unit.

50. On information and belief, the FBI had adopted procedures under its "medical mandates" program and Manual Administrative and Organization Procedures (MOAP) for FFDE's.

51. The FFDE of Mr. Doe violated those internal procedures as well as 5 CFR 339.101 *et. seq.* and the Rehabilitation Act of 1973.

52. For example, among other things, the FBI demanded Mr. Doe provide it a full psychiatric and psychological history and a list of any medications he was taking.

53. On information and belief, the Bureau perceived Mr. Doe, wrongly, as mentally impaired.

54. In assessing and conducting the examination, the Bureau deemed Mr. Doe a "sexual predator" based on an isolated incident of conduct.

55. The Agency also surmised that Mr. Doe's marital status and status as a father played into his "disturbance" concluding that middle-aged, married men and fathers who showed interest in younger females were psychologically impaired and needed treatment.

56. The Bureau <u>ordered</u> Mr. Doe to seek treatment for his disturbance with its Employee Assistance Program, which by its very terms is a voluntary program designed to provide employees a confidential, voluntary source of assistance.

57. Mr. Doe, like other Special Agents, works long hours, under great stress.

58. Mr. Doe's counterterrorism work is highly specialized and valuable to the Agency and to the American public.

59. Mr. Doe has never been a "security risk". He has scrupulously and competently handled all of his work duties and his behavior, even if true, as it related to the female, posed no threat whatsoever to national security and was not a basis for concluding an actual or perceived impairment.

60. On information and belief, the Bureau has routinely subjected Agents to psychological FFDE's without proper knowledge of and/or compliance with the limitations on such examinations imposed by the Rehabilitation Act, the EEOC or its own regulations.

## IV.  COUNT ONE: VIOLATION OF THE REHABILITATION ACT OF 1973: IMPROPER MEDICAL EXAMINATION

61. Paragraphs 1-60 are realleged and incorporated by reference herein as if fully set forth in this Count.

62. The Rehabilitation Act of 1973, which incorporates the standards of the Americans with Disabilities Act, makes it unlawful to discriminate against an employee based on actual or perceived disability.

63. Mr. Doe asserts he was considered to be mentally impaired when he was ordered to under psychological treatment for his workplace conduct.

64. Mr. Doe was ordered to undergo treatment from a licensed medical provider, to waive any right to confidentiality for this third party treatment and to report the diagnosis, prognosis and treatment of that third party provider to his Agency, including to non-medically trained personnel.

65. The examination constituted a "medical" or fitness for duty exam.

66. The Plaintiff was ordered to obtain treatment under the threat of discipline, including termination.

67. The examination in this case, was neither job related nor did it address a condition or action that triggered a legitimate reason for the inquiry.

68. Mr. Doe's behavior involved, at best, workplace misconduct; it was not an expression of a psychiatric or psychological disturbance.

69. Mr. Doe's behavior should have been and was addressed through the Agency's disciplinary process.

70. At best, Mr. Doe's behavior was inappropriate. Although the Agency did not find Mr. Doe to have engaged in sexual harassment, it gave a *post hoc* rationalization of its directed medical exam as required to address sexual harassment.

71. Assuming the conduct was a form of sexual workplace misconduct that conduct does not equate with a psychological or psychiatric impairment.

72. The Agency examination was therefore wrongful and violated the Rehabilitation Act, which limits such examinations.

73. The examination was a severe violation of Mr. Doe's rights. It essentially makes misconduct in the workplace equivalent to a psychological or psychiatric impairment.

74. Assuming the Agency could have conducted some initial inquiry, forcing Mr. Doe to have six months of therapy, at his own expense, and to sign a waiver and surrender all records of the "therapy", was extreme and well beyond the bounds of legitimacy.

75. As a result, Mr. Doe suffered the very labeling and emotional distress the Agency claimed it was trying to address. Subjecting Mr. Doe to disclose details of his personal and family history, divulging medications and issues concerning his marriage was deeply disturbing to Mr. Doe.

76. The Agency's actions undermine the entire structure and purpose of employer mandated medical inquiries. They confuse and conflate disciplinary concerns with mental illness.

77. The Agency's conduct would actually discourage its employees, many of whom are in dangerous, stressful situations at the front lines of the Nation's defense, both of its civil liberties and against terrorism, from obtaining mental health assistance and counseling where it might be needed.

78. At part of its unlawful examination, the Agency abused its own Employee Assistance Program mandating Mr. Doe seek assistance and comply with certain terms when it was not necessary and where the Agency took no action to limit the use, access or dissemination of information.

79. Mr. Doe prays for emotional distress damages in the maximum amount authorized by law for each and every separate employee mandated visit to a medical professional, for attorney's fees and costs and for injunctive relief described below.

## V. COUNT TWO: WRONGFUL COLLECTION, USE AND DISSEMINATION OF MEDICAL INFORMATION

80. Paragraphs 1-79 are realleged and incorporated by reference herein as if fully set forth in this Count.

81. The Agency, on information and belief, wrongfully obtained deeply personal and private information regarding Mr. Doe's medical, psychological, personal and family histories and matters pertaining to his marriage and estrangement from his wife.

82. The Agency obtained, in essence, a psychological profile of Mr. Doe.

83. The records and information concerning Mr. Doe's examination and treatment was then collected, maintained and disseminated in a matter contrary to that directed by the Rehabilitation Act, which generally limits such collection, maintenance and use to medical personnel to determine whether the employee is a danger to himself or others or can or cannot perform the essential functions of their employment.

84. The information was disseminated to personnel who had no authority to access the information, used it for improper purposes and had neither the proper training nor ability to evaluate its meaning.

85. The information was collected for an improper purpose, by improper means. The Agency claimed some security based concern when none properly existed and it gave the medical information to personnel not to evaluate Mr. Doe's fitness, or, to see accommodations, but merely out of voyeuristic curiosity or worse, maliciousness.

86. Mr. Doe prays for emotional distress damages in the maximum amount authorized by law for each and every separate instance of wrongful disclosure of medical information, for attorney's fees and costs and for injunctive relief described below.

## VI. COUNT THREE: VIOLATION OF REHABILITATION ACT OF 1973: DEMAND FOR MEDICATIONS

87. Paragraphs 1-86 are realleged and incorporated by reference herein as if fully set forth in this Count.

88. The demand that Mr. Doe provide a description of the types and dosages of medications he was taking by the Agency was a violation of the Rehabilitation Act.

89. The Agency has given no explanation for this request and there was no legitimate rationale advanced for the inquiry.

90. Mr. Doe prays for emotional distress damages in the maximum amount authorized by law for each and every separate demand for medical information, for attorney's fees and costs and for injunctive relief described below.

## VII. COUNT FOUR: RETALIATION AND REPRISAL

91. Paragraphs 1-90 are realleged and incorporated by reference herein as if fully set forth in this Count.

92. The employer mandated examinations, demands for medical information and disclosures in this case were in reprisal and retaliation for Mr. Doe's assertion in his disciplinary process that he was being subject to disparate treatment based on race (African-American). The employer mandated examinations were designed to punish Mr. Doe for opposing his discipline and they continued after it was proposed and imposed.

93. Mr. Doe prays for emotional distress damages in the maximum amount authorized by law for each and every separate employee mandated visit to a medical professional, for attorney's fees and costs and for injunctive relief described below.

## VIII. COUNT FIVE: VIOLATION OF THE REHABILITATION ACT; DISCRIMINATION BASED ON PERCEIVED DISABILITY

94. Paragraphs 1-93 are realleged and incorporated by reference herein as if fully set forth in this Count.

95. The above acts, whether taken individually or collectively, constitute discrete and collective acts of discrimination based on perceived disability.

96.  Mr. Doe was not and is not psychologically impaired but was perceived to be so.

97.  The cost of Mr. Doe's medical care, the investigation into his security status, the mental and medical examination, the demand for surrender of confidential records, the failure to safeguard those records, the creation of records reflecting a perception of disability within the Agency, the prolonged six month nature of the inquiry and, as noted below, the derailing of Mr. Doe's EEO process, complete with Agency misrepresentations as to filing dates and the nature of claims all constitute actionable, concrete acts of employment discrimination, retaliation and reprisal.

98.  Mr. Doe prays for emotional distress damages in the maximum amount authorized by law for each and every separate violation of the Rehabilitation Act, for attorney's fees and costs and for injunctive relief described below.

## IX. COUNT SIX: REQUEST FOR INJUNCTIVE RELIEF

99.  Paragraphs 1-98 are realleged and incorporated by reference herein as if fully set forth in this Count.

100. The abuse and misuse of medical examinations and psychological inquiries by the Agency is a violation of law.

101. Mr. Doe requests the Court require the Agency to enter a decree that states it will limit psychological examinations, however it seeks to phrase them mandated or non-mandated, to examinations the bear on an employee's fitness for duty or that are required under law and which serve a legitimate Agency interest.

102. Mr. Doe requests this Court enjoin the Bureau from demanding employees seek psychological treatment and assessment at employee expense.

103. Mr. Doe requests that Agency segregate and limit the use and access of medical and psychological information so that supervisors and untrained medical staff neither use, access or disseminate such information contrary to the terms of the Rehabilitation Act.

104. Mr. Doe requests the Agency be ordered to conduct mandatory yearly training for employees on the Rehabilitation Act and its provisions as they relate to medical examination, use of medical information and the anti-retaliation and reprisal provisions of federal law.

105. Mr. Doe further requests that the Agency be mandated to adhere and follow the directives set forth in 5 CFR 339.101 *et. seq.* as the relate to FFDE examinations.

106. Mr. Doe further requests the Agency be mandated to comply with the processing terms and requirements of federal EEO law set forth at 29 CFR 1614.101 *et. seq.*

107. Mr. Doe further demands that the Agency immediately cease and desist from ordering employees to give waivers for medical information from third party providers in the manner done here. The demand for a release renders it inherently coercive and involuntary and the Agency, in cases where there is a true psychological concern, may mandate an examination at its own expense.

108. Mr. Doe demands that the Agency stop requesting medications employees are taking in any manner inconsistent with the Rehabilitation Act of 1973.

109. Mr. Doe prays for all attorneys' fees and costs incurred in securing injunctive relief.

Dated: June 17, 2013

Respectfully Submitted,

*[signature]*

Kevin E. Byrnes (DC Bar No. 480195
Grad, Logan & Klewans, P.C.
3141 Fairview Park Drive, Suite 350
Falls Church, Virginia 22042
Phone:  703/535-5393
Fax:  703/836-6289
kbyrnes@glklawyers.com
*Attorney for Plaintiff John Doe*